May I please record, I'd like to reserve two minutes for rebuttal. Okay, the claimant's established that he's disabled by his inability to sustain work and our position is that the ALJ erred in finding that he was able to perform his past relevant work, which was at the right level. And just at the outset, I'd like to say that even if he were able to perform sedentary work, he should be found disabled under the medical vocational guidelines. But beyond that, he's established that he cannot sustain work. And prior to, before he ceased working, he was working six hours a day, three to four days a week, and he was able to work full-time only by using his sick leave for the rest of the time. And the VEA has testified that that would not be competitive work. So it's the claimant's position he has made his case that he is disabled on two bases, either by his limitation to sedentary work or by his inability to sustain work on a competitive basis. One of the main issues in the case is the ALJ's treatment of Dr. Curtin, who has written three letters supporting Mr. Davis's claim. Well, Curtin's opinion itself varied considerably over time. And by 2004 said that he could work a full-time job but would be expected to miss a couple of days a month. Right. So, and Gitter had indicated that Davis's heart problems had resolved by April of 2000. So what's left? Well, there are a couple of things. If he were going to miss more than two days per month, that's not competitive work. So all along he had supported that the claimant cannot perform competitive work. And the other thing is, you know, we have Dr. Curtin's opinions, but it's helpful to look at Dr. Bender. He was an independent examining doctor. There's a lot of discussion about this congestive heart failure and cardiomyopathy and so forth. But everybody continues to diagnose him with these problems, even though they'll say it's compensative. And I think Dr. Bender's report at the transcript 212 is good on that point. And Dr. Bender did some exercise testing, and he found that he had a marked limitation in his exercise capacity based on a combination of problems. So that clearly supports the claimant's testimony, even though Dr. Gitter expected that he would get better. And he did dramatically improve from congestive heart failure, because with that condition he couldn't even walk across the room. But he continues to have fatigue, which Dr. Curtin says is connected to his combination of impairments. He does weigh over, well, he weighs about 300 pounds, which is also a factor to be considered. And between Dr. Curtin and Dr. Bender, I believe that he has fully made his case on this point. Ms. Tassinari? Yes. I don't know if I pronounced that correctly. I apologize if I didn't. Perfect. This is Judge Paez. I have one question with respect to the ALJ's credibility finding or partial credibility finding with respect to Mr. Davis. There seems to be some concern expressed by the ALJ that Mr. Davis did not bring to the attention of his doctors the extent of his condition, especially to Dr. Curtin, that he needed to rest periodically, he needed to lie down. There are certain things he couldn't do because he got tired, his fatigue. Yes. And that condition does not appear to be reflected in Dr. Curtin's medical records. What do you say about that? Well, Your Honor, it's true it's not reflected in his records, but it is reflected in at least two of his letters. I can't see the date on this one. I guess it's 2001 on that one letter and 2004 on the other letter. But I don't think doctors put down everything in their chart notes, and the purpose is a different thing. It's not trying to support his claim when he's getting his chart notes. So I'm not concerned by that. I see that in his letters, though, obviously Dr. Curtin was aware of it because he has said twice now that Mr. Davis will continue to have persistent and chronic problems with fatigue, dyspnea, and low exercise tolerance. He said that in 2001, and then he said it again in 2004. His multiple medical problems will predispose Mr. Davis to fatigue, decreased exercise tolerance, and an increased likelihood of infectious problems. So. Okay. Anything else now, or do you want to? I'll reserve my time. Okay. Mr. Elsberry? Good morning, counsel, and thank you for accommodating my need for my inability to travel today. To go straight to the point with Dr. Curtin's three letters, it's the position of the commissioner that the ALJ properly assessed and gave limited weight to those opinions based on their internal inconsistencies, particularly the inconsistencies over the period of time with no material change within Mr. Davis's condition. And in my brief, I detailed the numerous basis for visits to Dr. Curtin by Mr. Davis during those periods. And although in 2001, when he diagnosed inability to do any work whatsoever, no sedentary work at all, he then changed it to June 3rd, 2002, he changed it to eight hour a day, five days a week, normal breaks, sedentary. And the amount of the types of visits he had had between that period, between November of 2001 and June of 2002, he saw him for a cost, a recurrent cost, which was treated with robitussin, foot pain, which appeared to be tendonitis and was treated, and a crampy burning pain in his calves, which was diagnosed as probable peripheral vascular disease, which was later found not to be the problem. So the FDA noted there was no real basis for the change in his opinion, and subsequently it was the same between the 2002 opinion of sedentary work and then the 2004 opinion, which appears to be light work, although it's unclear whether Dr. Curtin is using the regulatory definition of light work or a lay version of light work. But nonetheless, between the June 2002 opinion of sedentary and the 2004 light work opinion, he was treated for a bad cost, which resolved antibiotics, foot pain, probable gout, which was resolved, depression, and ongoing monitoring of his diabetes and related medications. The FDA probably found that the changes in his opinion were inconsistent and accordingly gave minimal weight to those opinions. In part, he relied upon the evidence presented by Dr. Bender, which in itself constitutes substantial evidence, particularly in regards to the 2001 opinion, because Dr. Bender had measured on the treadmill test a capability of, I think, 7.0 METS, M-E-T-S, which Dr. Bruton said that a medical expert at the hearing testified such a score on an exercise treadmill test was indicative of an ability to perform light work and above sedentary. So, also based upon Dr. Bender's opinion, the non-examining physicians, Dr. Eder and Dr. Spray, also applied light work abilities and taking into consideration Dr. Bender's treadmill test. Accordingly, based on the inconsistency with the other doctors' opinions, the inconsistencies between Dr. Curtin's own assessments, particularly in relation to no substantive treatment between those opinions, the FDA probably gave limited weight, and this is consistent with case precedent as well as our regulatory guidelines for treating physicians' testimony. So, currently, the commissioner believes that the ALJ properly assessed that opinion or those opinions, gave clear and convincing and or specific and legitimate reasons for giving limited weight to those opinions, and properly found that Mr. Davis was capable of light work. In regards to the credibility, Mr. Davis' credibility, the ALJ also gave proper reasons there for finding him not fully credible, at least to the extent where he was asserting an inability to perform less than light work. One of the reasons was the basis that Mr. Davis gave for quitting his job, which was not based on incapacitation but on a decision not to accept another position, similar position in another city because he didn't want to move. Mr. Davis asserted that this was a point when he was doing less than full-time work and was not able to get the record shows that he was reporting to Dr. Glitter. However, at this same time, the end of 1999, in November and December, that his congestive heart failure symptoms had fully resolved. In fact, Dr. Glitter so opined and Dr. Curtin even noted. So, although much later, I believe, I don't have that date right in front of me, but Dr. Curtin also acknowledged resolution of those symptoms. He also noted, as judged by us, noted that there were some concerns about the support within Dr. Curtin's records regarding the need to lay down and the severity of the limitations. And, in fact, those weren't represented in his reports to Dr. Curtin or to Dr. Glitter. And more specific to the need for frequent bathroom visits, there is no support in the record. There's no evidence that he ever reported that to any doctors. There is a point where Dr. Glitter noted a possible problem, although it's not clear that Mr. Davis raised this. Dr. Glitter noted it could be avoided by dosage frequency and other options. And that was in May 1999 at ER 162. Moreover, the bathroom visits were alleged to be a result of the diuretics and the nurse treating him or addressing his diabetic medicine, Nurse Lynn, also notes no concerns about visits to the bathroom. Mr. Davis' response that the doctors don't record everything, while that might be true, it's still the LJ is left with what the evidence presents, and he needs to interpret that evidence as it's presented. And if it's not there, it's not there. And that doesn't detract from his finding, or in fact supports it then, because it's the lack of that recording that he relied on. Mr. Davis also raised the issue in their briefing about obesity, LJ's reliance on that credibility finding. I believe that's a red herring argument. He did not consider obesity or lack of exercise or diet regimen in the credibility finding on obesity. In fact, he discussed that on severity and, in fact, found that regardless of whether he was compliant with a diet or exercise regimen, he was accounting for the functional limitations from obesity and diabetes by limiting them to light work, which, again, is consistent with the opinions of Dr. Speeder, Dr. Spray, and Dr. Bruton, particularly with Dr. Bruton's interpretation of the treadmill test. Additionally, he considered the fact that Mr. Davis used the Internet, I think it was three to four hours, two to three hours, three to four times a day, assisted his wife with her business. Mr. Davis conceded these are sedentary activities, but argued that this is consistent with disability under the GRIDS guidelines. This conclusion of disability assumes evidence not in the record. The transferability of skills has not been addressed. The LJ did not reach step five. The assertion was that the LJ did, or the VE did state that there were no jobs that his skills would transfer into. But nonetheless, the vocational expert's testimony was equivocal. He was unsure that step was not developed or that issue was not developed because the LJ didn't reach that step. And nonetheless, this is a credibility finding, and the LJ noted the inconsistency of a subjective allegation of total disability with even sedentary work. So we're not at the stage of determining whether he's capable of sedentary or light. We're determining the credibility of the subjective allegations. So, again, the commissioner asserts that the LJ's credibility finding is supported by substantial evidence and free of legal error. And the final argument of the step five, sedentary establishes disability under the medical vocational guidelines, I think I've already addressed. Stating above, the evidence doesn't support that right now. It has not been fully developed. So even in the event that this court were to find that there was some error. Mr. Ellisbury, your time has expired, so you might want to wrap it up, please. Okay, Ashley, that's it. I am done, unless there's any questions. Thank you very much. Okay, thank you. Ms. Tassinari? Yes, there are a couple of things I'd like to clarify. Much has been said about the difference between Dr. Curtin's opinions, that he had gone from saying that Mr. Davis could work sedentary work in 2001 to saying that he could work light in 2004. It's quite clear that when he said light duty, he was not using the term of art as the ALJ was referring to in his decision. Under the CFRs, light duty means that you can lift up to 20 pounds occasionally and 10 pounds frequently, and Dr. Curtin clearly said no lifting. So his opinion in 2004 is fairly distinguishable from his 2001 opinion. Another thing is Dr. Bruton, his opinion is inconsistent because he said that Mr. Davis is a Class II patient, and in the definition, I have this in my brief at pages 7 and 8 of my reply brief, ordinary physical activity results in fatigue, palpitation, dyspnea, or angina pain. Dr. Bruton also said that the claimant could perform work that was light or, quote, just above sedentary, unquote. There's really no explanation for the difference between his opinion and Dr. Curtin's opinion. In terms of the evidence, there's really no doubt that if Mr. Davis is limited to sedentary work, then he has made his case because the VE, he really agonized. He obviously had thought about it before the hearing. He said at testimony he gave reasons why he thought there should be other work, but he could not identify any sedentary work that Mr. Davis had skills transferable to. So there is really no point in going back. The VE has said what he said. Mr. Davis has established he's unable to sustain his past work, and so the burden shifted. Whether the OIJ got to that point at the hearing or not, in his own mind, the evidence was developed in that regard. So claimant submits there's no need for a remand for that particular purpose. Okay, thank you both. Again, our apologies for the hassle at the outset, but we appreciate your argument. And the matter just argued will be submitted, and the Court will stand in recess for the day.
judges: Rymer, T.G. Nelson, Paez